IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNISTRIP TECHNOLOGIES, LLC,<br><br>                Plaintiff,<br><br>v.<br><br>LIFESCAN, INC and LIFESCAN SCOTLAND, LTD.,<br><br>                Defendants. | CIVIL ACTION<br>NO. 14-4518 |

<u>OPINION</u>

**Slomsky, J.**                                                                                                                            **December 28, 2015**

## I.     INTRODUCTION

Plaintiff UniStrip Technologies, Inc. ("UniStrip") brings this civil action against Defendants LifeScan, Inc. and LifeScan Scotland, Ltd. (collectively, "LifeScan") for various antitrust violations in connection with the market for blood glucose test strips that both parties manufacture and distribute. (Doc. No. 47.)

Before the Court is LifeScan's Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC"), which was filed on May 1, 2015. (Doc. No. 54.) For the following reasons, the Court will deny LifeScan's Motion to Dismiss Counts I, II, III, IV, and VI of the Second Amended Complaint, and will grant LifeScan's Motion to Dismiss Count V.

## II.    BACKGROUND

LifeScan is a wholly owned subsidiary of Johnson & Johnson. It manufactures and sells blood glucose self-monitoring systems that allow individuals with diabetes to maintain healthy blood glucose levels. (Doc. No. 47 at 1, 7.) Blood glucose self-monitoring systems consist of disposable, single-use test strips that are read by an accompanying electrochemical meter. (Doc.

1

No. 56 at 14.)  The electronic meter can only read test strips that are designed to be compatible with it.  (Id.)  For this reason, the market for blood glucose self-monitoring systems consists of two sub-markets—one for electronic meters and one for accompanying test strips.  (Id. at 14-15.)

In 2010, the United States market for blood glucose self-monitoring systems was valued at approximately $3.97 billion, with the test strip sub-market valued at $3.46 billion.  (Doc. No. 47 at 1.) Four competitors in the United States market, including LifeScan, share more than 83% of the market.  (Id. at 2.)  Of these competitors, LifeScan vaunts that it is the leading manufacturer and seller of blood glucose self-monitoring systems with more than 30% of the United States market.  (Id.)

Blood glucose monitoring system manufacturers make their products available on the market by selling them to distributors, wholesalers, mass merchandisers, pharmacies, and direct-to-patient managed mail order service providers.  (Id. at 4.)  LifeScan offers these resellers various rebates and discounts on its blood glucose self-monitoring products in order to lower the high cost of its products.  (Id. at 9.)  For example, LifeScan offers discounts that significantly depress the cost of its electronic meters, an enticement to many individuals to purchase them.  (Id.)  Once the patient acquires a LifeScan meter, that patient is locked into purchasing LifeScan meter-compatible test strips, which are used by many diabetics multiple times per day.  (Id.)  Because LifeScan previously was the only manufacturer of LifeScan meter-compatible test strips, LifeScan cornered the market on these test strips.  (Id.)  The entry of a competitor, such as UniStrip, into the market for LifeScan-compatible test strips therefore would disrupt LifeScan's market strategy.

LifeScan markets a monitoring system, OneTouch Ultra, which consists of an electronic meter and test strips that, until recently, were the only test strips available that were compatible

with this meter.  (Doc. No. 56 at 15.)  Thus, LifeScan captured 100% of the market for those test strips.  (Doc. No. 47 at 3.)  In November 2013, however, the United State Food and Drug Administration approved a test strip, UniStrip1, which UniStrip developed to be compatible with—and thus usable in—OneTouch Ultra meters.  (Id.)  With this regulatory approval, UniStrip now was permitted to sell its lower-cost UniStrip1 and compete with LifeScan in the market for test strips that were compatible with the OneTouch Ultra meter.  (Id.)

Following the entry into the market of UniStrip's generic alternative to LifeScan's test strip, LifeScan began entering into exclusivity contracts and agreements with its resellers.  (Id. at 13.)  According to Plaintiff, LifeScan would offer rebates and discounts to resellers on the condition that those resellers would not purchase any non-LifeScan products compatible with the OneTouch Ultra meter.  (Id.)  Should a reseller purchase a non-LifeScan product, such as the UniStrip1 test strip, LifeScan allegedly would reduce or terminate its offered rebates and discounts.  (Id.)  The reseller then would face steep price increases on LifeScan products.  (Id.)  UniStrip alleges that there are "exclusionary contracts with resellers [that] include terms or provisions that expressly or impliedly condition the payment of rebates, discounts, allowances and other financial incentives on the agreement and/or understanding that the customer not purchase sell [sic] non-LifeScan products."  (Id.)  UniStrip also asserts that "LifeScan has also made these threats in-person, over the phone, in e-mails and other written correspondences notwithstanding any express penalty term in the agreement with the reseller."  (Id. at 13-14.)  The exclusionary conditions, UniStrip asserts, have prevented resellers from purchasing UniStrip products due to the reseller's fear of losing the coveted rebates and discounts LifeScan offers.  (Id.)

3

UniStrip alleges that these exclusivity agreements violate antitrust law because they impede competition by foreclosing the market to LifeScan's competitors. (Id. at 15.) UniStrip also contends that LifeScan's exclusionary strategy amounts to an illegal attempt to maintain its monopoly power over the test strip market. (Id.) Because LifeScan conditions rebates and discounts on all of its products and not only test strips, UniStrip asserts that this strategy is an illegal bundling scheme that violates antitrust law. (Id.) UniStrip argues that LifeScan's conditions impermissibly allow it to terminate a discount on any of its products, such as that on the OneTouch Ultra meter, if the reseller purchases a UniStrip1 test strip. (Id.)

As a result of UniStrip's allegations of LifeScan's anticompetitive behavior, UniStrip brought this suit against LifeScan on July 29, 2014. (Doc. No. 1.) In its Complaint, UniStrip claims that LifeScan has violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and also has violated applicable state law by tortiously interfering with actual and prospective contracts. (Id.) UniStrip filed a First Amended Complaint on November 19, 2014. (Doc. No. 30.) LifeScan responded by filing a Motion to Dismiss on December 19, 2014. (Doc. No. 37.)

A hearing was held on LifeScan's Motion to Dismiss on February 19, 2015. (Doc. No. 46.) Following the hearing, UniStrip filed a Second Amended Complaint on March 30, 2015.[1] (Doc. No. 47.) LifeScan filed a Motion to Dismiss the Second Amended Complaint on May 1, 2015. (Doc. No. 54.) Plaintiff responded to LifeScan's Motion to Dismiss on June 2, 2015 (Doc. No. 56), and LifeScan replied on June 17, 2015 (Doc. No. 58). For the following reasons, the Court will deny LifeScan's Motion to Dismiss in part and will grant it in part.

---

[1] In view of the filing of the SAC, the Motion to Dismiss the First Amended Complaint (Doc. No. 37) was denied without prejudice as moot. (Doc. No. 48.)

### III.  STANDARDS OF REVIEW

#### A. Legal Standard for Motion To Dismiss

In deciding a motion to dismiss, the court "accept[s] as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and views them in the light most favorable to the non-moving party." DeBenedictis v. Merrill Lynch & Co., 492 F.3d 209, 215 (3d Cir. 2007). The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) establishes that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

#### B. Legal Standard for Exclusive Dealing

When a party asserts violations of antitrust laws based on allegations that "a business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market," the court must

determine which of two tests applies to that party's claims.  Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993); see also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 268 (3d Cir. 2012).  Specifically, if a Plaintiff alleges violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act due to an exclusive dealing arrangement, the court will determine if it should apply the "price-cost test" or the "rule of reason."  Id. at 268-69.[2]  When a plaintiff's claim of exclusive dealing by a competitor is based predominately on the allegation that the mechanism of exclusion is pricing practices—that is, pricing products below that competitor's cost of production—the price-cost test applies.  Id.  This test requires a plaintiff to demonstrate "that the defendant's prices are below an appropriate measure of the defendant's costs."  Id. at 269 (quoting Brooke Grp., 509 U.S. at 222 (quotations omitted)).   In contrast, when a plaintiff's allegations of exclusive dealing are not centered on pricing practices alone, the "rule of reason" test applies to determine if the arrangement will "foreclose on competition in such a substantial share of the relevant market so as to adversely affect competition."  Id. at 271.  In applying this test, the court can consider "a showing of significant market power by the defendant . . . , substantial foreclosure [of the market] . . . , contracts of sufficient duration to prevent meaningful competition by rivals . . . , and whether there is evidence that the dominant firm engaged in coercive behavior."  Id. at 271-72 (citations omitted).

## IV.   ANALYSIS

### A.  The Rule of Reason Applies in this Case

A fundamental disagreement between the parties here is whether the Court should apply the rule of reason or the price-cost test when evaluating UniStrip's allegations of exclusive

---

[2] "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time."  ZF Meritor, 696 F.3d at 270.

dealing by LifeScan in violation of antitrust law.  According to LifeScan, UniStrip's allegations that LifeScan threatened to terminate rebates is only a pleading of aggressive price competition. (Doc. No. 54 at 15.)  LifeScan argues that because UniStrip claims anticompetitive behavior based on predatory pricing, the price-cost test applies, which requires Plaintiff to allege that LifeScan has priced its test strips below cost in an attempt to eliminate competition.  (Id. at 15-16.)  LifeScan presses the Court to apply the price-cost test because UniStrip's allegations, in essence, are that pricing is the primary mechanism of LifeScan's exclusionary conduct.  (Id. at 16.)  Because UniStrip has not alleged that LifeScan's prices are below cost, LifeScan would have the Court dismiss this case pursuant to the price-cost test as outlined in Brooke Group.  (Id.)

UniStrip, on the other hand, insists that the Court apply the rule of reason because UniStrip pleads nowhere in its SAC that price was LifeScan's mechanism of exclusion, but rather pleads that it engaged in anticompetitive, predatory conduct.  (Doc. No. 56 at 23-24.) UniStrip contends that the exclusivity of the arrangements that LifeScan has imposed on resellers of its products prevents competitors from entering the market, not price competition.  (Id. at 24.) As such, UniStrip asserts that the rule of reason applies and LifeScan simply mischaracterizes the claims made against it in an attempt to have the case dismissed.  (Id.)

Here, viewing the allegations in the SAC in the light most favorable to Plaintiff UniStrip, it is clear that the claims made in its SAC plead anticompetitive behavior rather than merely competitive pricing.  LifeScan's arguments that the price-cost test applies is therefore unpersuasive at this stage of the litigation.

In ZF Meritor, the Third Circuit examined a plaintiff's claims of exclusive dealing in connection with the market for heavy-duty truck transmissions.  696 F.3d at 263.  The facts of that case are quite similar to those presently before the Court.  The plaintiff alleged violations of

Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act because the defendant entered into agreements with purchasers of the transmissions that required the purchase of a specific quantity of the defendant's products, rather than those of a competitor, or else rebates offered to the purchasers would be terminated.  Id. at 265.  The Third Circuit acknowledged that generally, a claim that rebate programs "which condition the . . . rebate on the costumer's purchasing of" its products should be analyzed under the price-cost test.  Id. at 275.  Despite this acknowledgment, the Third Circuit applied the rule of reason because of the exclusionary nature of the agreements, finding that predatory pricing was not alleged to be the primary mechanism of exclusion.  Id. at 277.  Specifically, the several-year length of the contracts and the defendant's dominance in the market for a necessary product were the primary factors leading it to apply the rule of reason.  Id.  The Third Circuit also considered that, apart from the formal contracts, correspondence that threatened the termination of rebates warranted the application of the rule of reason because it amounted to exclusionary anticompetitive behavior and not predatory pricing. Id. at 277-78.

In this case, as in ZF Meritor, UniStrip alleges that rebates have been offered to purchasers of LifeScan's products on the condition that a competitor's products would not be purchased.  UniStrip similarly alleges that these conditions extended for several years (Doc. No. 56 at 41), and were contained in contracts or were made as threats in correspondence between LifeScan and purchasers.  UniStrip also points to LifeScan's dominance in the market for test strips that are compatible with LifeScan's meters.  Given the similarities between this case and ZF Meritor, the rule of reason applies here based on the allegations in the SAC.[3]

---

[3] The Third Circuit has made clear that "above-cost prices [do not] render an otherwise unlawful exclusive dealing agreement lawful."  ZF Meritor, 696 F.3d at 278.

### B. Analysis of the Motion to Dismiss Each Count of the SAC

LifeScan has moved to dismiss the entirety of UniStrip's SAC for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 54 at 10.) Accordingly, the Court will evaluate each of UniStrip's six Counts seriatim to determine which will survive the Motion to Dismiss.

#### 1. Count I (Exclusionary Arrangements in Violation of Section 3 of the Clayton Act) Will Not Be Dismissed

UniStrip first alleges in its SAC that LifeScan has violated Section 3 of the Clayton Act, 15 U.S.C. § 14, by engaging in unlawful exclusionary agreements. (Doc. No. 47 at 16.) As noted, UniStrip asserts that LifeScan has threatened purchasers or potential purchasers of UniStrip's test strips not to buy them, or else LifeScan would terminate highly-valued rebates on its own products. According to UniStrip, LifeScan has engaged in such exclusive dealing arrangements with the purpose of eliminating competition from the market for LifeScan meter-compatible test strips. Though these agreements may not contain express exclusivity clauses in writing, UniStrip argues that the absence of such a clause does not preclude review of its allegations.

Under Section 3 of the Clayton Act, an entity may not "make a sale or contract for sale of goods . . . or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor . . . where the effect . . . may be to substantially lessen competition or tend to create a monopoly" in the market for those goods. 15 U.S.C. § 14. The Third Circuit has held that Section 3 Clayton Act violations are held to stricter standards than the less restrictive provisions of the Sherman Act. Barr Labs, Inc. v. Abbott Labs, 978 F.2d 98, 110 (3d Cir. 1992). Under this stricter standard, when a court reviews the "legality of an exclusive dealing arrangement under the

Clayton Act," it must determine "whether the competition foreclosed constitutes a substantial share of the relevant market." Id. The court need not limit its review of the exclusive dealing arrangement to an express exclusivity requirement in a contract. LePage's Inc. v. 3M, 324 F.3d 141, 157 (3d Cir. 2003) (citing Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).

UniStrip's Clayton Act claim set forth in Count I will not be dismissed. UniStrip has alleged that LifeScan engaged in anticompetitive behavior in the form of requiring purchasers of its products to commit to agreements in which those purchasers were influenced not to buy a competitor's products. UniStrip has identified the specific product and geographic markets that it alleges it is excluded from, as well as several actual and potential distributors in those markets that have been foreclosed from conducting business with UniStrip due to LifeScan's alleged exclusive dealing. UniStrip further alleges that this scheme was concocted for the purposes of chilling competition in the market and maintaining Defendants' monopoly. This allegation is squarely in line with the prohibitions found in Section 3 of the Clayton Act.

LifeScan provides the Court with a test to determine if a "substantial lessening of competition" exists under the rule of reason: a court should examine "(1) the extent of market foreclosure, (2) the duration of the allegedly anticompetitive arguments, (3) the nature of the anticompetitive conduct, and (4) any procompetitive justifications for defendants' conduct." (Doc. No. 54 at 24 (citing ZF Meritor, 696 F.3d at 286-89).) In ZF Meritor, the Third Circuit considered these factors in weighing the sufficiency of the evidence that a jury considered at trial in evaluating plaintiff's claims under the rule of reason. At this stage of the litigation, however, the Court does not evaluate the sufficiency of the evidence. Rather, in applying the pertinent standard of review at the motion to dismiss stage, at which the litigation is currently, UniStrip

has adequately pled in the SAC plausible allegations of a violation of Section 3 of the Clayton Act.

### 2. Count II (Contracts and Agreements in Violation of Section 1 of the Sherman Act) Will Not Be Dismissed

UniStrip next alleges that LifeScan has violated Section 1 of the Sherman Act, 15 U.S.C § 1, by engaging in contracts and agreements that restrain competition to the detriment of consumers. (Doc. No. 47 at 20.) To reiterate, UniStrip asserts that LifeScan has entered into exclusivity contracts and agreements with resellers—who might potentially purchase UniStrip products—that specifically eliminate UniStrip from the relevant test strip market. These agreements, which predicate discounts on LifeScan products on the condition that UniStrip products are not purchased, restrain trade by excluding LifeScan's competitor from the market. Because UniStrip offers a potentially lower-priced alternative product, UniStrip asserts that consumers are disadvantaged and injured by LifeScan's scheme to jettison the competition from the market. UniStrip is also financially harmed by its inability to sell its product and grow in the market.

Section 1 of the Sherman Act makes it illegal to make a "contract [or] combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. As stated above, alleged Sherman Act violations are held to a less restrictive standard than those made under the Clayton Act. Barr Labs., 978 F.2d at 110. To establish a cognizable violation of Section 1 of the Sherman Act for unreasonable restraint of trade due to exclusive dealing, a plaintiff must show "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v.

Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir 1997). Under this test, Plaintiff's claims as set forth in Count II of the SAC are plausible and will not be dismissed.

To show concerted action, a plaintiff must reference a contract or agreement that demonstrates an unlawful arrangement. Mathews v. Lancaster General Hosp., 87 F.3d 624, 639 (3d Cir. 1996). UniStrip has done so by repeatedly alleging that illegal exclusivity agreements exist. LifeScan even acknowledges these references to the agreements. (Doc. No. 58 at 5.) Moreover, to demonstrate anticompetitive effects within the relevant product and geographic markets in rule of reason cases, a plaintiff can satisfy this burden by proving the defendant's market power in the relevant market. Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996). UniStrip could plausibly prove this factor, as it has pointed to LifeScan's dominance in the market for blood glucose self-monitoring systems—which LifeScan has admitted—as well as LifeScan's share of virtually the entire sub-market for LifeScan meter-compatible test strips. Finally, UniStrip has alleged that the exclusive dealing agreements are illegal, and that these agreements have deprived and will continue to deprive UniStrip of revenues, profits, and market growth, resulting in injury.

At the motion to dismiss stage, Plaintiff only must advance plausible claims. UniStrip's Section 1 Sherman Act allegations are plausible, and Defendants' Motion to Dismiss as to Count II of Plaintiff's SAC will be denied.

### 3. Count III (Attempted Monopolization in Violation of Section 2 of the Sherman Act) Will Not Be Dismissed

Count III of UniStrip's SAC charges LifeScan with alleged violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempts to monopolize the test strip market. (Doc. No. 47 at 25.) UniStrip claims that by engaging in exclusionary and anticompetitive practices, LifeScan has schemed to preclude competitors of the OneTouch Ultra meter-compatible test strips from

competing in the market. By such action, LifeScan has illegally attempted to maintain its monopoly over it. UniStrip asserts that given LifeScan's dominance in the market, there is a dangerous probability that LifeScan will maintain or even expand its monopoly in the relevant markets, allowing it to set prices, reduce output, and exclude competition from those markets. UniStrip alleges that LifeScan's anticompetitive and exclusionary practices were undertaken with the specific intent of monopolizing the market for test strips used in OneTouch Ultra meters.

Section 2 of the Sherman Act provides that an entity may not "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. A defendant has violated Section 2 of the Sherman Act when it "possesses monopoly power in the relevant market" and "willfully acquired or maintained that power." LePage's Inc., 324 F.3d at 146 (citing United States v. Grinnell Corp., 384 U.S. 563 (1966)). "Exclusive dealing arrangements are of special concern when imposed by a monopolist." ZF Meritor, 696 F.3d at 271; see also U.S. v. Dentsply Intern., Inc., 399 F.3d 181, 187 (3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist"). A monopolist can be found to have willfully maintained its monopolist power when it engages in exclusive dealing, especially where that exclusive agreement is alleged to be based on the bundling of rebates. LePage's Inc., 324 F.3d at 147.

Under these principles, UniStrip has pled a violation of Section 2 of the Sherman Act sufficient to survive LifeScan's Motion to Dismiss. UniStrip has alleged—and LifeScan has conceded—that LifeScan is the leading manufacturer and seller of blood glucose self-monitoring systems, with a significant share of the market. UniStrip has also alleged that LifeScan controls virtually the entire market for test strips that are compatible with its OneTouch Ultra meters.

13

These allegations are plausible to demonstrate LifeScan's monopolist power in the relevant market.

Furthermore, UniStrip repeatedly alleges in its SAC that LifeScan has engaged in exclusive dealing, in violation of several antitrust laws, and that this exclusive dealing consists of bundling schemes by which rebates are offered on the condition that multiple products from LifeScan are purchased. Viewing the allegations in the SAC in the light most favorable to Plaintiff, this claim is plausibly indicative of LifeScan's willful attempt to maintain its monopoly power in the market for test strips that are compatible with its meters. Applying <u>LePage's Inc.</u> and the plausibility standards for pleading at the motion to dismiss stage, then, UniStrip has adequately pled a violation of Section 2 of the Sherman Act against LifeScan.

Therefore, Count III of Plaintiff's SAC will remain, and Defendant's Motion to Dismiss Count III will be denied.

### 4. Count IV (Bundling in Violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act) Will Not Be Dismissed

In Count IV of its SAC, UniStrip alleges that LifeScan engaged in an illegal bundling scheme, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. (Doc. No. 47 at 28.) Using the same factual scenarios set forth above, UniStrip claims that LifeScan offers discount and rebate programs to induce customers to purchase its OneTouch Ultra meters, and then lock those customers into purchasing LifeScan's accompanying test strips. Because LifeScan threatens to eliminate those discounts and rebates on the condition that resellers only purchase LifeScan products that are compatible with its products, rather than those of a competitor, UniStrip argues that this bundling scheme amounts to anticompetitive exclusive dealing. UniStrip asserts that this bundling scheme has the effect and

intent of barring competition from entering or expanding in the market, as well as to maintain its monopoly in the market.

Bundling of rebates occurs when a producer of one product induces customers to purchase that product instead of a similar product produced by a competitor by offering the customer discounts on another one of its products that its rival does not produce. LePage's Inc., 324 F.3d at 155. This market strategy by a monopolist has the potential anticompetitive effect of "foreclos[ing] portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." Id. To demonstrate the impermissibility of a bundling scheme under antitrust law, a plaintiff must show that: 1) there is an "agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or [bundled]) product"; 2) that the "seller has sufficient economic power with respect to the [bundled] product to appreciably restrain competition"; and 3) that "interstate commerce is affected." SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1061 n.3 (3d Cir. 1976) (quotations omitted); see also LePage's Inc., 324 F.3d at 155. If these elements are shown, a defendant is potentially in violation of the Sherman and Clayton Acts.

UniStrip meets these requirements in its SAC, and for this reason, the Motion to Dismiss Count IV will be denied. Under the first requirement, UniStrip made several allegations of bundling contracts and agreements, both written and oral, between LifeScan and named third-party buyers. With specificity, UniStrip alleges that each agreement required the buyer to purchase LifeScan test strips—the bundled product—or else rebates and discounts on other LifeScan products, such as the meter, would be discontinued or reduced. As to the second requirement that Plaintiff demonstrate Defendants' economic power in the market for the bundled product, UniStrip has alleged that LifeScan control virtually the entire market for

OneTouch Ultra meter-compatible test strips, and LifeScan admits to being the leader in the market for blood glucose self-monitoring systems. Finally, UniStrip meets the third requirement by averring that the alleged bundling arrangements affect interstate commerce. Accordingly, UniStrip has alleged a plausible and impermissible bundling scheme in violation of antitrust laws.

Having sufficiently pled a plausible claim against LifeScan with regard to the alleged illegal bundling arrangement, UniStrip may proceed on this claim. The Court will therefore deny LifeScan's Motion to Dismiss Count IV.

### 5. Count V (Tortious Interference with Prospective Contractual Relations) Will Be Dismissed

In Count V of the SAC, UniStrip claims that LifeScan tortiously interfered with prospective contractual relations between UniStrip and resellers. UniStrip alleges that potential resellers were discouraged from purchasing the UniStrip1 due to LifeScan's contracts with them that threaten to revoke rebates and discounts on LifeScan products should the UniStrip1 be purchased. LifeScan allegedly contacted UniStrip and informed it of these contracts, and that LifeScan would be enforcing them. Because LifeScan's intentional conduct is without any legitimate business justification, UniStrip pleads, LifeScan has caused UniStrip financial injury and has made it difficult for UniStrip to remain as a competitor on the market.

The parties agree that both the laws of Pennsylvania and North Carolina govern these claims, and that both laws are essentially the same. (Doc. No. 46 at 57; Doc. No. 54 at 30). Under Pennsylvania law, an action for tortious interference with prospective contractual relations requires the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective

> relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Maverick Steel Co. v. Dick Corp./Barton Malow, 54 A.3d 352, 355 (Pa. Super. 2012). Regarding the first element—the existence of a prospective contractual relationship—there must be a demonstration of "something less than a contractual right, [but] something more than a mere hope," Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979), and that there is "an objectively reasonable probability that such a contract would arise," Applied Tech. Intern., Ltd. v. Goldstein, Civ. No. 03-848, 2004 WL 2360388, at *6 (E.D. Pa. Oct. 20, 2004). Under the law of North Carolina, a plaintiff in an action for tortious interference with prospective economic advantage "must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." Walker v. Sloan, 529 S.E.2d 236, 242 (N.C. Ct. App. 2000) (quotations omitted).

The essence of both states' laws require that the plaintiff must establish that a prospective contract likely would have been agreed to by the plaintiff and a third party in the absence of the defendant's alleged interference and that the defendant acted without a legitimate business justification. Given these requirements, UniStrip fails to make a plausible claim of interference with prospective contractual relations.

First, UniStrip has not plausibly pled that it was likely that a contractual relationship would have occurred in the absence of LifeScan's alleged tortious interference. UniStrip lists a number of resellers with which it potentially could have engaged in contractual relations,[4] but it

---

[4] In its SAC, UniStrip names the following potential resellers: "Walgreen's, Burlington Drug, AmerisourceBergen, GEMCO Medical, NC Mutual Wholesale Drug, Arriva Medical, CCS Medical, and DDP Medical Supply." (Doc. No. 47 at 31.)

does not plead that there were actual relations or potential contracts with those resellers that "would have ensued" beyond "a mere hope." There is no plausible allegation provided by UniStrip that there was any "objectively reasonable probability" that a contract would arise from the dealings with prospective buyers. See Applied Tech. Intern., 2004 WL2360388 at *6. UniStrip's allegations include unnamed prospective resellers, and there is meager information about its dealings with the prospective resellers it names. In short, the Court cannot identify "specific business relationships suffering as a result of the defendant's interference" that UniStrip is required to plead. Id.

Second, UniStrip merely claims that LifeScan improperly acted without justification, yet it fails to provide any reasoning that underlies this assertion. Merely reciting this element of the tort is not sufficient to reach the levels of a plausible claim.

Accordingly, given these insufficiencies, Count V of Plaintiff's claim will be dismissed.

### 6. Count VI (Tortious Interference with Actual Contractual Relations) Will Be Not Dismissed

UniStrip avers that LifeScan also is in violation of Pennsylvania and North Carolina law for tortious interference with actual contractual relations. UniStrip's only cognizable claim under Count VI is that LifeScan interfered with a contract with reseller Discount Drug Mart ("DDM"), an Ohio pharmacy. (Doc. No. 47 at 33.) UniStrip asserts that, after DDM had purchased the UniStrip1, LifeScan had "informed DDM that its contracts with Humana and Medicare beneficiaries would not pay rebates" on LifeScan products if it sold non-LifeScan products. (Id.) Afterwards, DDM requested that it return its purchase to UniStrip, and UniStrip accepted the request.

To claim tortious interference with actual contractual relations under Pennsylvania law, a plaintiff must prove the same elements as provided above for tortious interference with

prospective contractual relations, except that an actual contract must be shown to have existed. Maverick Steel Co., 54 A.2d at 355.  Under the law of North Carolina, the "tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff." Austin Maint. & Const., Inc. v. Crowder Const. Co., 742 S.E.2d 535, 546 (N.C. Ct. App. 2012).

UniStrip alleges a plausible claim of the existence of actual contractual relations because it points to a stock order transaction in which it engaged with DDM.  In addition, the other elements of this cause of action are properly alleged in the SAC.  To counteract UniStrip's claim, LifeScan essentially argues that it was cloaked with a privilege in the course of competition to interfere with the relationship of a competitor selling a similar product.  However, UniStrip has alleged wrongful antitrust conduct independent from the claim of tortious interference of actual contractual relations.  Therefore, Count VI of Plaintiff's SAC will not be dismissed.

## V.    CONCLUSION

UniStrip has alleged plausible claims of antitrust violations and tortious interference with actual contractual relations against LifeScan. Accordingly, the Court will deny LifeScan's Motion to Dismiss Counts I, II, III, IV, and VI.  LifeScan's Motion to Dismiss Count V, alleging tortious interference with prospective contractual relations, will be granted.  An appropriate order follows.